## Lawrence A. Davidson and Doris Davidson, Appellants, v. Antonette Iwanowski, Appellee.

### Gen. No. 44,648.

Heard in the first division of this court for the first district at the December term, 1948. Opinion filed June 5, 1950. Released for publication June 26, 1950.

JAMES B. McKEON, of Chicago, for appellants.

McBride & McLennon, of Chicago, for appellee; Thomas G. McBride, of Chicago, of counsel.

Mr. Presiding Justice Tuohy delivered the opinion of the court.

Plaintiffs, Lawrence A. Davidson and Doris Davidson, his wife, filed their complaint in the superior court of Cook county seeking a declaratory judgment that they, as bona fide purchasers, acquired title to certain real estate. Defendant Antonette Iwanowski filed her cross-complaint for an accounting and a reconveyance of said real estate. The master in chancery, to whom the cause was referred, found the issues of fact in favor of plaintiffs and against cross-complainant. From a decree sustaining exceptions to the master's report, entered July 1, 1948, ordering plaintiffs to reconvey said property to defendant upon the payment to them by defendant of the sum of $2,495.54, the amount found due on an accounting taken by the court upon stipulation of the parties, plaintiffs appeal.

Complaint is made that the trial court erred in finding (1) that a confidential relationship existed between the parties hereto, and (2) that the deed here under consideration, absolute on its face, was intended to operate as a mortgage. In view of the conclusions reached by us, we deem it unnecessary to determine whether or not a confidential relationship with all its legal implications existed between the decedent and plaintiff, Lawrence Davidson, but shall limit our observations to a consideration of whether or not the deed, absolute on its face, was in fact a mortgage.

Paragraph 13, ch. 95, Ill. Rev. Stat. 1949 [Jones Ill. Stats. Ann. 83.13], provides as follows:

"Every deed conveying real estate, which shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage."

154

It thus becomes apparent that the determination of the disputed issue necessitates the ascertainment of the intention of the parties to this conveyance.

 That the burden of proof rests upon the party asserting a deed, absolute in form, to be a mortgage, that he must so establish by clear and convincing proof, and that parol evidence is admissible for such purpose, are well settled. *Totten v. Totten,* 294 Ill. 70. It has further been held that positive evidence of intention is not required. It is sufficient if the evidence is clear and convincing, even though conflicting. *Kulik v. Kapusta,* 303 Ill. 208, 214.

In the case under consideration the essential evidence was all adduced by interested witnesses, defendant and her daughter on the one hand, and plaintiff Lawrence Davidson on the other. Testimony as to conversations had prior to the execution of the conveyance in question, by the contending parties, was sharply conflicting, and, in view of their important bearing upon the issue here to be decided, it is advisable to review them carefully, as well as the facts and circumstances out of which they arose.

Prior to June 29, 1940, the defendant and her husband, Anthony Iwanowski, since deceased, were the owners in joint tenancy of a home located at 14227 Wabash avenue, Riverdale, Illinois, subject to a Home Owners Loan Corporation mortgage dated May 31, 1934, securing an indebtedness of $4,700, payable in monthly instalments of $39.17 and interest, plus taxes, repairs and maintenance. On June 29, 1940, the balance due on the mortgage was approximately $3,484. Defendant and her husband had purchased the lot upon which the home was built in 1927 for $2,500, and the building cost was $10,000.

Sometime in the year of 1930, defendant and her husband met plaintiff Lawrence Davidson at a civic club meeting. Davidson had been a precinct captain

and after he and Iwanowski attended political meetings together they would frequently return to the Iwanowski home for a cup of coffee and sandwiches or lunch after the meeting. Iwanowski was a carpenter by trade; Davidson was a civil engineer for the Forest Preserve District of Cook County, for the Ivanhoe Park District, and for the Village of Dolton. He and Iwanowski became very close friends. During the depression Davidson got Iwanowski jobs as foreman for the P. W. A., judge of election and various odd jobs as a carpenter from time to time. In 1934, the mortgage above referred to was placed on the property. In 1935, Iwanowski was badly injured and was in the hospital for some time.

The Iwanowski home was a seven-room face brick bungalow. The attic was roughed in and no room was completed at the time of the original construction. There was a two-car brick garage on the premises. In 1938, in the hope of additional income, Iwanowski finished the incomplete second floor by building a five-room apartment so that the Iwanowskis could move upstairs and rent the downstairs apartment. Iwanowski himself did all the work of building this apartment over a period of several months with materials purchased by a son, George. Another son, Fred, occupied the first floor for a few months prior to June 1940. Davidson testified that sometime in 1938, Iwanowski called at the Davidson home and said he was going to adopt Davidson; that Iwanowski said his natural son did not want the home and he was going to let Davidson take it over; that he told Iwanowski it was a poor idea and that he had better sell it; that a few months later Iwanowski wanted to know if Davidson would take it over and Davidson again told him he should sell it; that Iwanowski told Davidson it cost between $75 and $100 a month to keep it up and that he was unable to carry the payments on the

Home Owners Loan Corporation mortgage and was not able to earn enough money to pay taxes and keep the house out of default; that there were further talks along this line three or four different times in the next couple of years; that in the early part of June 1940, Iwanowski said, ''I am going to give you one more chance and this is the last. It is either now or never. I have got to get rid of my property.'' Davidson testified that around June 20, 1940, Iwanowski came over to his house and at that time he asked Iwanowski what the latter meant by ''turning the property over'' to him; that Iwanowski told him he would give him a deed with the right of Iwanowski and his wife to live upstairs; that he told Iwanowski he did not know whether such an arrangement could be worked out; that he said he would like to talk to an attorney and Iwanowski said, ''Let's go over to an attorney.'' These conversations, according to Davidson, were unattended by any third party, and Iwanowski having died long before the trial, the court did not have the benefit of his testimony.

Subsequent to this last conversation Davidson consulted and hired as his attorney one P. P. Flick. Flick was active in political affairs in the community with Davidson and was also acquainted with Iwanowski. Flick suggested that instead of a joint tenancy arrangement between Iwanowski and the Davidsons that there be an absolute conveyance by the Iwanowskis to the Davidsons, with a lease to the Iwanowskis of the upstairs apartment. It was originally suggested that the lease be for 10 years at $1.00 per year, and subsequently an option for an additional 10-year period was agreed upon.

About the middle of the last week of June 1940, Davidson, Flick and Iwanowski went to the Home Owners Loan Corporation to determine the situation with reference to the loan. Davidson expressed sur-

157

prise to learn that the past due payments on the mortgage amounted only to $117.51. They looked up the taxes and found that the 1938 taxes had been paid and that, although the first instalment of the 1939 taxes was due, it was not yet in default. There were no other liens or encumbrances of any kind upon the property. In checking Iwanowski's deed they found that it was held in joint tenancy by Anthony and the defendant Antonette Iwanowski. Up until this nothing had been said to Mrs. Iwanowski about the plans of days before the deal was closed. Davidson testified that the only conversation he had with her on the subject was about three o'clock one afternoon, a few days before the deal was closed. Davidson testified that he went to her home and explained the matter to her and she said she thought it was all right. Davidson testified, "Mrs. Iwanowski was agreeable to it at the time that we were in the kitchen. She said she thought it was all right. She did not ask me what I was paying for the property. Nothing was ever said about my reconveying the premises to them in the future. . . . The only occasion that I talked to her was this one upstairs in the kitchen." This conversation took place the last week in June, a few days before the conveyance was executed.

The substantial dispute in the testimony involves the conversations that took place between Davidson, decedent and Mrs. Iwanowski, some in the presence of the daughter Amelita Iwanowski, during the few days before the signing of the deeds, commencing on the afternoon that Davidson, Flick and decedent had gone to the HOLC office. Mrs. Iwanowski testified that sometime before six o'clock on an evening in the last week in June decedent came home with Davidson; that the daughter Amelita was there; that the four of them had supper together; that her husband introduced the conversation by saying, "We was today in the city."

Mrs. Iwanowski testified, ''My husband started to tell he went with Mr. Davidson and Mr. Flick to the Home Loan to see if there isn't any lien, mortgage, something. They find out there was three payments that wasn't paid. And then they went to the City Hall. . . . So Mr. Davidson says (to decedent), '. . . You going to give me your deed as security and I going to pay all expenses and repairs and heating so you could live upstairs.' He said something about paying the mortgage, he say, 'Any time you wish to get your home back,' he said 'you pay me what I spend on that and you could have it.' . . . He said, 'I am going to pay on taxes and mortgages' and furnish the heat. He said he going to move. I say, 'What for are you going to do that?' He said they going to pay $50 a month, something like that, they going to pay the expenses. That is all what was telling. My husband agree. He was always talking with me but for me was awfully funny, that. *I never heard anything about this before that time,* this was the first time they were talking that story. I was surprised then and I going to lose my home. Davidson said, 'You don't have to worry about that, you won't lose your home, it is security.' I said, 'What are you going to get for me?' He said, 'I am going to give you a lease.' He said, *'You could pay that and after another ten years you could pay or your children could pay.* You don't have to worry.' I don't believe him because I work so hard, I invest my money. I don't know how that going to make—I don't like it. I don't like it. He say, 'You don't have to worry,' because he was such good friends with my husband.'' (Italics ours.) On cross-examination she said (relating what Davidson had said): ''He was not going to buy, just help out my husband because they was such good friends like father and son. He said, 'I wouldn't let you down.' My daughter was present.'' Mrs. Iwanowski stated that

Davidson came each day after that trying to persuade her to agree; that they were talking about changing the entrance to the building so that the apartments could be reached by separate stairways without intrusion on the ground floor apartment. Mrs. Iwanowski stated that on Sunday before the Monday the deed was signed Davidson came again, telling them that he would pick them up early Monday morning. She testified, ''On Sunday it was talking, be all right, I won't lose the home, that I was satisfied on that. . . . He (Davidson) said, 'Don't worry, you going to get your home back as soon as you pay what I owe for that, invest in that house, you get back your deeds.' '' She testified that on Monday, Davidson drove them over to the lawyer's house where the deed was signed about eight o'clock in the morning; that Mr. Flick said to sign and gave no further explanation than that she and her husband sign the papers; and that Davidson gave her husband a check for $10. Amelita Iwanowski substantially corroborated her mother as to the conversation that took place in her presence. Mrs. Iwanowski testified that Anthony Iwanowski died on October 10, 1940, a little over three months from the date the deeds were executed; that his health was poor at the time the transaction took place; and that he died from lung trouble. She testified that Mr. Iwanowski did not read the lease to her or the deed to her and that she did not read the documents herself.

Amelita Iwanowski testified that she lived with her parents after the upstairs was completed in the latter part of 1938; that she had given her father and mother financial assistance from time to time prior to that time, and that she assisted them in keeping up the payments on the house, as did her brothers; that during the time she was living at home in the latter part of 1938 Davidson came over frequently to visit her father, as often as two or three times a week; that

160

her father thought an awful lot of Davidson and called him "my boy, my son"; that he would put his arm around Davidson's shoulders and say, "Gee Dick is a wonderful man, he is an honest man"; that they spent a good deal of time together; that her father would frequently say, in making decisions, "Dick suggested this" or "Dick thought it would be better to do this way"; that he relied entirely upon Davidson's advice; that the father had financial difficulties and was unable to get steady employment. She testified, with reference to the conversation related by Mrs. Iwanowski which took place the evening after the visit to the HOLC, that in response to her mother's objections to giving a deed Davidson said, "You are not going to lose your home, the only thing is he is going to give me a deed as security for the home, and I am going to make the payments on the home, pay the taxes, make all the necessary repairs and heat the place. . . . This will be security to me, and as security to you I am giving you a lease. . . . In the event you feel you are able to get back on your feet and make the payments I will be more than glad to give you the deed back to the house whenever you are ready to do that, and we will figure out how much I put out after deducting $50 a month for rent, and you pay me whatever you owe me, and you have ten or twenty years to pay, and if you can't pay the children will pay it back to me." She further testified, "My mother did not approve of all this, she still said, 'I don't want to give up my home, I don't want to give up my home. I am sure we could take care of it in our own way.'" Again referring to the same conversation, she testified, "Mr. Davidson said, 'You don't have to worry, Mrs. Iwanowski, you are not losing your home. I am taking over the deed as the security and whenever you are ready to take the home back I will be more than glad to give it back to you, after we decide whatever you

161

owe us.' He described how that would be determined. He said that Mother had the security, Mother and Dad both had a lease as security so they would have a place to live . . . *that they would have ten to twenty years to pay back whatever Dad owed them, or Mother owed them.* They figured $50 to be a fair price for rent, and if the expenses, taking in the HOLC loan and the taxes and the heating of the home and making the improvements, necessary improvements, that would be deducted, they would figure how much that was and deduct the rent for that same period of time, and the difference would be paid back to them . . . ." (Italics ours.) She further testified that on Sunday of that week, following the conversation referred to, "Mr. Davidson came over and asked Mother if she reached her decision, if she had made up her mind as to what she was going to do. By that time I guess Mother was pretty well convinced she wasn't losing her home, after all, the deed was security for the Davidsons and the lease was security for Mother and Dad, and she said that sounded all right to her."

The undisputed evidence is that in 1940 the reasonable value of the property was $9,000 and that at the time of the trial in 1946 it could be sold for $15,000.

From the foregoing, several significant conclusions are inescapable: first, that whether or not the facts created a confidential relationship as a matter of law, there was certainly great trust reposed by the old carpenter in the younger civil engineer whom he wished to adopt; second, that as a result of the transaction the plaintiffs were enabled to move into a comparatively new seven-room apartment in premises which represented an investment of $12,500, the value of which was then approximately $9,000, with no obligation on their part other than to afford living quarters upstairs for the defendant and her husband and to advance from time to time the future mortgage pay-

ments, and payments for taxes amounting in all to less than $100 a year, neither of which was in substantial default; third, that the deed in question was made subject to the mortgage to the HOLC, but the grantee did not in the deed assume and agree to pay the mortgage indebtedness; the undertaking was that he would advance from time to time sufficient funds to take care of the payments of the mortgage; and, fourth, that the defendant owner in joint tenancy of the premises in question, until a few days before the deed was executed which deprived her of title to her home, had no knowledge whatsoever of the transaction.

Inasmuch as the decision here rests upon a question of the credibility of defendant and her daughter on the one hand, and plaintiff Lawrence Davidson on the other, the reasonableness of the respective stories is an important consideration. We are of the opinion that the chancellor was entitled to believe the story of Mrs. Iwanowski and her daughter to the effect that Davidson assured defendant, in the presence of her daughter, that he was agreeing to advance the money to meet the mortgage payments, taxes, and maintenance costs, as they came due, out of his deep friendship for the decedent, and that the deed was to be merely as security for the loan which would be repaid sometime within the next 20 years, either by decedent, defendant, or their children.

Even though decedent because of the affection he had for Davidson was willing to turn over to him this home which represented the savings of a lifetime, it must have strained the trial court's credulity to believe that the defendant, who was an owner in joint tenancy of the property and who, according to all the evidence in this case had no such affection or regard for Davidson as her husband had, would be willing to surrender her rights in the property merely for the privilege of living there for a period which might not equal her

163

natural lifetime. We think that the defendant's version of what was said as to the property being held by plaintiffs as security for future advances is more reasonable than is the story that she surrendered her equity in the property for the grossly inadequate consideration here related.

██ While, generally, mere inadequacy of price will not be considered as sufficient to set aside a deed or to have a deed declared a mortgage or the basis of a trust, yet gross inadequacy of price is always considered as an evidentiary fact. *McDonnell v. Holden,* 352 Ill. 362, 367; *Totten v. Totten, supra.*

██ The transaction here involved cannot constitute a sale to plaintiffs. It lacks all of the ordinary and fundamental characteristics of a sale. Nothing except the nominal sum of $10 was paid at the time of the taking of the deed. There was no fixed purchase price. There was no indebtedness of any kind, then existing, which plaintiffs could extinguish and claim as a consideration for the deed. The indebtedness, if any, was to be in the future for advances to be made by plaintiffs, and the definite amount could not be ascertained except at the time when defendant would be entitled to reconveyance and tender the amount due upon an accounting.

This leads us to a further consideration. What compelling reason existed for any such claimed sale to the plaintiffs? The property was not distressed property. There was no threat of foreclosure of the mortgage by the HOLC. The payments due on the mortgage (three in number) amounted to $117. The taxes for 1938, as already noted, had been paid, and defendant had not received at that time a bill for the 1939 taxes. The daughter living at home and defendant's sons were assisting defendant and her husband in meeting the payments on the mortgage as well as the taxes. There was no reason for fearing foreclosure of the HOLC

164

mortgage and a possible deficiency decree, against which defendant and her husband might desire to be protected, as sometimes occurs, and for that purpose convey the property to one who would assume the mortgage indebtedness and secure a release of defendant and her husband of their liability. No such considerations existed in this case, not even an express assumption of the mortgage indebtedness by plaintiffs. On the other hand, it is clear to us that had defendant and her husband rented the modern seven-room apartment they originally occupied, together with the modern brick garage, they would have had, together with what the daughter and sons contributed, ample funds to meet the payments on the mortgage, taxes and necessary upkeep of the property.

 Plaintiffs argue that the evidence fails to establish that the deed was intended as a mortgage for the reason that it was entirely optional with the grantors to pay money at an indefinite time and optional to receive or not to receive a conveyance. In support of this proposition they cite *Knowles v. Knowles*, 86 Ill. 1, where the following statement appears:

"It is not within the line of ordinary experience that a man having money to loan for interest is willing to loan it without a fixed rate of interest, and to be repaid at the mere pleasure of the borrower."

The *Knowles* case is plainly distinguishable on the facts. In the first place, the consideration for the deed was entirely adequate, the proof indicating that the value of the property was not greater than the amount paid. It also appears that the only evidence tending to substantiate the mortgage theory was a conversation testified to by defendants that if defendants would turn over the place to the plaintiff he would give them the money and " 'he was to take the rents and keep the place in repair; and pay the taxes and interest on

165

the money, and when we wanted the place he would give it back for the money and interest whenever paid.' '' In the instant case, aside from the inadequacy of the consideration, there was the positive testimony of both defendant and the daughter to the effect that the money was to be paid back within the period of the lease. While the testimony of the mother was not phrased as a lawyer or even a literate layman might have expressed it, a reading of the entire context makes the meaning clear even though defendant was uneducated and had considerable difficulty with the English language, and she is unequivocally corroborated by the daughter.

Counsel also cite the cases of *Bearss v. Ford,* 108 Ill. 16, and *Hickey v. Barrett,* 212 Ill. App. 86. In each of these cases the consideration for the deed was found to be not inadequate and there was no obligation upon the alleged borrower to ever make any repayment of the alleged loan. This clearly, if the testimony of defendant and her daughter is to be believed, was not the situation here.

 The fact that the mortgage was made for the purpose of securing a future debt does not avoid the mortgage for indefiniteness. In *Collins v. Carlile,* 13 Ill. 254, the court said (p. 259):

". . . 'We think it clear, that a mortgage made *bona fide,* for the purpose of securing future debts, expected to be contracted in the course of dealing between the parties, is a good and valid security.' . . .

". . . that a mortgage, intended to secure future advances, need not express that object in the mortgage itself, though it would be better if it did."

The above case was followed in *Melody v. Arcola State Bank,* 249 Ill. App. 85. The fact that no time was fixed for repayment does not affect the status of an instrument as a mortgage. *Helm v. Boyd,* 124 Ill. 370.

While we have felt it unnecessary to determine the question of whether or not a confidential relationship existed at law, it is beyond contradiction that decedent placed great confidence and trust in Davidson. In the case of *Staufenbiel v. Staufenbiel,* 388 Ill. 511, the court defined the elements which constitute such a relationship in the following language (p. 522):

". . . A fiduciary relation exists in all cases in which there is confidence reposed on one side and a resulting superiority and influence on the other. It is settled law that courts of equity will not set any bounds to the facts and circumstances out of which a fiduciary relationship may spring. The fiduciary relationship, with its legal incidents, includes not only all legal and technical relations such as guardian and ward, attorney and client, principal and agent and the like, but it extends to every possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side and resulting domination and influence on the other. . . . The relationship need not be legal but it may be either moral, social, domestic, or merely personal. . . ."

 In the instant case, viewed in the light most favorable to the plaintiffs, it appears that Iwanowski was willing to transfer title to his home for the privilege of living in the upstairs apartment free from the worry of rent, mortgage commitments, upkeep and taxes. That he was motivated in great part by his trust and confidence and affection for Davidson, and by a desire to live in close proximity to him, is patent on the face of this record. That these motivations were not present in the case of defendant is equally certain. As was said in *Helm v. Boyd, supra,* "The question is one of intention to be ascertained from all the circumstances." There, too, the relation of the grantee father to the grantor, his daughter, akin to a corres-

167

ponding feeling expressed by decedent toward David-
son as his son, was held competent to be considered
as evidence that the relation naturally gave the grantee
great influence over the grantor. Iwanowski died with-
in a few months after the equity in the property had
been conveyed. It appears that plaintiffs have filed
this bill for a declaratory judgment because they want
to sell the property, which the evidence shows has
a present value of $15,000, and acquire a very substan-
tial financial advantage as the result of the transaction.

The accounting required by the chancellor makes
the plaintiff whole, and the decree does equity to all
parties concerned. The decree of the superior court of
Cook county is affirmed.

*Affirmed.*

FEINBERG, J., concurs.

NIEMEYER, J., dissents. The claim that the warranty
deed is a mortgage, upon which the majority opinion
is based, and the claim of abuse of a confidential rela-
tionship, upon which the decree of the trial court was
entered, are afterthoughts, unsupported by proper
pleading or sufficient evidence.

When the complaint was filed defendant answered
under oath "that said deed was signed by her under
threats of bodily injury, and when she signed said
deed she did not know what it contained, being excited
and under fear." Issue was joined and a hearing had
before a master, but no testimony was offered in sup-
port of these allegations. The master reported, finding
that the deed was an absolute conveyance and recom-
mending a decree in accordance with the prayer of
the complaint. Defendant procured new counsel and,
having obtained leave, filed an amended answer and
counterclaim under oath in which she abandoned her
former position and alleged that the deed was executed
by herself and husband pursuant to an oral agreement
and that it was understood and agreed between the

168

parties at and before the execution of the deed that "such deed was not intended to be an absolute conveyance or gift, but instead that it was intended only as security in the nature of a mortgage to secure the plaintiffs for such sums as plaintiffs should advance for the payments made in (on) the mortgage on such premises, less a reasonable rental of the plaintiffs for the occupancy of the first floor apartment of said premises." Issue was joined, the case re-referred to the master and further testimony was heard.

Davidson was examined by defendant under section 60 of the Civil Practice Act [Ill. Rev. Stat. 1949, ch. 110, par. 184; Jones Ill. Stats. Ann. 104.060]. He testified, without contradiction, that about 1938, defendant's husband began talking with him about taking over the property, saying that his boys did not want the place, that it cost between $75 and $100 a month to keep the place up; that he, Davidson, told him he thought it was a poor idea and that he, Iwanowski, should sell the place; the subject was brought up three or four different times in the next couple of years and each time Davidson told him he should sell the property; that in early June 1940, Iwanowski said "I am going to give you one more chance, . . . It is either now or never. . . . I have got to get rid of my property"; that shortly thereafter Davidson asked Iwanowski what he meant by "turning the property over," and he said he would give Davidson a deed and he would have the right to live upstairs; that at Davidson's request they went to see an attorney, who later drew up the deed and lease in evidence; that he, Davidson, never loaned Iwanowski any money; that in an amended and additional answer filed in a suit brought by defendant (the exact nature and disposition of this case is not shown) he, Davidson, said that if the deed should be set aside the plaintiff in that suit (defendant here) would owe him about $1,540; that neither de-

fendant nor her husband had promised to pay him that money. This testimony is of the same probative force as the uncontradicted testimony of other witnesses (*Woodham v. Miller*, 319 Ill. App. 388) and is binding on defendant.

The master reported, finding that no confidential relationship existed between Davidson and defendant's husband; that Davidson never acted as an agent of or in any fiduciary capacity for defendant's husband; that in consequence of proposals made by defendant's husband to Davidson, commencing in and about 1938, Davidson agreed to take over the premises, pay all outstanding obligations, including the obligations on the mortgage and taxes, and give defendant's husband a lease of the second floor at $1.00 per year for ten years, with an option for an additional ten years; that the deed and lease were executed pursuant to that agreement; that the transaction was a bona fide sale of the premises, supported by considerations which were adequate at the time when the transactions took place. The trial court sustained exceptions to this report and entered an order finding that a confidential relationship existed between plaintiffs on the one hand and defendant and her husband on the other at the time of the transactions culminating in the execution and delivery of the deed and lease; that the deed and lease do not express the understanding between the parties; that the confidence placed by defendant and her husband in plaintiffs has been violated by the plaintiffs since the time of making and entering into the transaction; that plaintiffs were not guilty of any fraud or misrepresentation of fact at the time of the making of the transaction in question; that because of the trust and confidence reposed by the defendant and her husband in the plaintiffs the latter were able to secure substantial interests in the property for which they paid no consideration other than $10; that

170

plaintiffs are not entitled to retain the benefits obtained through their confidential relationship with the defendant and her husband; that the defendant is entitled to have the transaction set aside and to have a reconveyance from the plaintiffs upon payment of the amount found due.

An indispensable requisite to a fiduciary relation "is confidence reposed on one side and resulting domination and influence on the other." *Staufenbiel v. Staufenbiel*, 388 Ill. 511; *Fisher v. Burgiel*, 382 Ill. 42; *Seeley v. Rowe*, 370 Ill. 336. Defendant alleges only that Davidson and her husband "became very close confidants and very fond and close personal friends." The evidence shows that they were very friendly and that Iwanowski had great confidence in his friend. There is no evidence that he ever consulted Davidson about any business transaction or had any business dealings with him other than the matter now under consideration, or that Davidson ever advised or attempted to influence him in any business transaction. In respect to the deed and lease, the uncontradicted evidence is that, so far as Davidson and Iwanowski are concerned, the proposals came from Iwanowski over a period of several years, commencing in 1938, and that Davidson did not seriously consider them until in June 1940. After Iwanowski stated that he meant to give Davidson a deed and keep a right to live upstairs, Davidson took Iwanowski to a lawyer. An investigation was made as to the balance due on the mortgage, the condition of the taxes and absence of other liens before Davidson accepted Iwanowski's proposal. The essential element of domination and influence of Davidson over Iwanowski is wholly lacking. As said in *Pfaff v. Petrie*, 396 Ill. 44, 51: "A fiduciary relationship must be based on something more than the fact that the parties are neighbors and that a friendship exists between them." In *Johnson*

*v. Lane,* 369 Ill. 135, plaintiffs sought to set aside a deed from a father to his son. The court said (p. 148):

"While John was frequently with his father the last few weeks of his life, there is nothing in the record to indicate any relation of confidence or trust between them other than would ordinarily exist between a father and his son. There is no evidence that the defendant acquired a dominion over his father or any control of his business, or that he exercised or attempted to exercise any influence in the conduct of his business. His presence at the time the deed was made did not raise any presumption of a fiduciary relationship, as such is known in the law. . . . *Where it is sought to establish a fiduciary relation by parol evidence, the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (Neagle v. McMullen,* 334 Ill. 168; *Winkelman v. Winkelman,* 307 id. 249; *Pillsbury v. Bruns,* 301 id. 578.)" (Emphasis added.)

By her own testimony, Davidson and defendant were opposing bargainers, dealing at arms' length. Mrs. Davidson was not an active factor in the transaction.

The trial court and the majority of this court agree that the consideration was grossly inadequate. This must be shown by clear and convincing evidence, and burden is on defendant. The trial court found that plaintiffs secured "substantial interests in the property for which they paid no consideration other than $10.00." This finding ignores the admissions of the counterclaim and the uncontradicted evidence that plaintiffs undertook to and did pay the taxes and the unpaid and future monthly payments on the mortgage, keep the premises in repair and give defendant and her husband a 20-year lease to the second floor, with heat and water, for the nominal rental of $1.00 a year. The majority opinion of this court says, "The undisputed

evidence is that in 1940 the reasonable value of the property was $9,000 and that at the time of the trial in 1946 it could be sold for $15,000." The only basis for this statement is the testimony of Dickinson, a witness for defendant, who stated on cross-examination, "My opinion as to the value of the property, was for the entire property, as is. *I have no opinion what the property would be worth subject to a 20 year lease to the second floor,* because I don't get into those things at all." (Emphasis added.) As the deed and lease were parts of a single transaction, plaintiffs took the property incumbered by the HOLC mortgage and the 20-year lease to defendant and her husband. We must take judicial cognizance of the fact that the lease was a burdensome incumbrance on the property, greatly reducing its value and salability. There is no evidence of the value of the property, subject to this incumbrance.

The remaining question is whether the deed and lease were intended to be a mortgage securing an indebtedness of defendant and her husband for advances made by Davidson in payments on the HOLC mortgage, taxes and maintenance of the premises. Defendant's case must be judged by the case made by her counterclaim (*Trust Co. of Chicago v. Sutherland Hotel Co.,* 389 Ill. 67) and proof supporting the counterclaim. (*Leitch v. Sanitary District,* 386 Ill. 433.) Her first contention, stated in her sworn answer, was that she signed the deed "under threats of bodily injury," and "did not know what it contained, being excited and under fear." By her amended answer and counterclaim, also under oath, she alleges that she and her husband signed the deed pursuant to an oral agreement and that it was intended as security in the nature of a mortgage for moneys to be advanced by Davidson, it being understood at and before the execution of the deed that "defendant and her husband

would be *permitted* by plaintiffs *at any time* to pay to the plaintiffs the moneys so advanced by the plaintiffs, less a reasonable rental, and that upon such payments the plaintiffs would reconvey the premises to defendant and her husband, or the survivor." (Emphasis added.) She alleged further that "for some years prior to June, 1940, the defendant's husband suffered from declining health and was unable to carry on his occupation as a carpenter with sufficient regularity to enable him to support his family and meet the payments, taxes and expenses on the above described property. During the same period there was a scarcity of carpenter work which together with his declining health made it very difficult for the defendant's husband to earn sufficient money to meet his obligations. As a result the defendant and her husband were for some time in embarrassed financial circumstances and found it necessary to borrow moneys from friends, and children, to enable them to keep up the mortgage payments on the property and to pay taxes thereon. The plaintiff, Lawrence A. Davidson, for a long time knew of the failing financial circumstances of the defendant and her husband and offered to advance to the defendant and her husband the sums of money necessary. . . ." Defendant testified that Davidson told her, *"Any time you wish to get your home back,* you pay me what I spend on that and you could have it." (Emphasis added.) Her daughter testified that Davidson said, *"In the event you feel you are able to get back on your feet and make the payments* I will be more than glad to give you the deed back to the house *whenever* you are ready to do that." (Emphasis added.) By her allegation and proof defendant and her husband were to be permitted, not obligated, to pay any time defendant wished to get her property back, or in the event she felt able to get back on her feet and make payments. An essential of a mortgage—

174

debt, legal liability or obligation—is lacking. *Caraway v. Sly*, 222 Ill. 203. In that case plaintiff asked the court to declare a deed made by him to be a mortgage. A demurrer was sustained and the bill dismissed. The striking similarity of the bill in that case and the counterclaim before us is evident from the statement of the court summarizing the allegations of the bill, as follows:

"The facts stated in the bill and admitted by the demurrer are, that complainant, being indebted to Allen Sly in the sum of $3400, obtained a loan from him of $6200, and to secure said sums of money conveyed to him the real estate described in the bill; *that complainant was to be permitted to redeem from said conveyance by paying said indebtedness when he became able to do so;* that Sly knew complainant's circumstances and that it would require much time for him to pay said indebtedness; that the conveyance was given to secure Sly and to give complainant sufficient time to pay said indebtedness; that the consideration was much below the market value of the land . . . ." (Emphasis added.)

In sustaining the action of the trial court, the Supreme Court said:

"In this case the attempt is to have a conveyance absolute in form declared to be a mortgage to secure the payment of money,—or, in other words, to secure a debt,—while the averments of the bill show that there was no indebtedness to be secured. . . . There was a mere option to pay at some time in the future if the complainant should be able to do so, and if he should become able it would be optional to pay, or not. Such an agreement would never be barred by lapse of time and there never could be any foreclosure. The right to redeem and the right to foreclose are reciprocal (*Fitch v. Miller*, 200 Ill. 170), but the bill shows

175

that there was no debt which could have been enforced against the land by foreclosure, either by Sly in his lifetime or by defendants since his death. An agreement giving the complainant a mere option to pay when he should be able and desire to do so, with an agreement to re-convey upon such a payment, did not constitute a mortgage, and the averments of the bill, if proved, would not entitle the complainant to any relief.''

In the earlier case of *Knowles v. Knowles,* 86 Ill. 1, where the court refused to declare the deed to be a mortgage, it said (p. 9) :

"If, as Matthew says, no time was fixed for the repayment of the money, but, as both he and his wife, Catharine, say, she was simply to have the right to have the property back whenever she repaid the money, it is not perceived the complainant could ever have enforced repayment by a suit at law on the loan, or by a bill to foreclose, treating the deed as a mortgage. The debt would only mature by her electing to extinguish it; and, before maturity, its payment could not be enforced.''

To the same effect are *Kelly v. Lehmann,* 297 Ill. 33, 61; *Third Nat. Bank of Mt. Vernon v. Norris,* 331 Ill. 230, 236, 237; *Lackey v. First Nat. Bank of Oblong,* 309 Ill. App. 308; *Williams v. Griffith,* 310 Ill. App. 574; *Harrison v. Harrison,* 326 Ill. App. 678.

The only witnesses ·to the character of the transaction are plaintiff, on the one side, and defendant and her daughter on the other. No distinction can be made between them as to interest. However, the defendant is a totally discredited witness. The inconsistency of her sworn answer and the amended answer and counterclaim, also under oath, convicts her of having knowingly sworn falsely to one or the other. The transaction as testified to by plaintiffs is neither unusual nor

176

unreasonable. Iwanowski initiated it. His declining health and inability to work and support his family and to carry the property with the mortgage and taxes except by borrowing from friends and children, is admitted by the counterclaim. The boys were not interested. After occupancy of a few months one of them moved out of the first floor shortly before the deed to plaintiffs was executed. Although the daughter had come home to help, Iwanowski feared, as she testified, that she might get married and put him back in the same place where he started from. Rightly or wrongly he feared the future—wanted to be relieved of the burden of the property and yet be assured of the right to live in it without cost or responsibility for its upkeep. The deed to plaintiffs and the lease to himself and defendant effectively accomplished his purpose. Defendant joined in the execution of both instruments. The transaction is the same in character and prompted by the same motives as a conveyance of property in consideration of the promise of the grantee to provide a home for the grantor. Such conveyances are common, and if the promise of the grantee is fulfilled the courts uphold them in the absence of actual fraud or undue influence in procuring the conveyance. The trial court expressly found that plaintiffs were not guilty of any fraud or misrepresentation of fact at the time of the transaction. No charge is made by defendant that plaintiffs failed to make the payments on the mortgage and taxes and keep the property in repair.

Defendant's version of the transaction makes an unreasonable and unattractive agreement for plaintiffs. As said by the court in *Kelly v. Lehmann, supra:* ''If, as we understand complainants, they were simply to have the right to have this property conveyed to them whenever they re-paid the money defendant had invested, it is not perceived how defendant could ever

have enforced re-payment by a suit at law on the loan or by a bill to foreclose, treating the deed as a mortgage. The debt would only mature by complainants electing to extinguish it, and before maturity its payment could not be enforced. It seems to us to be so clear that an arrangement of this character would be so undesirable to the lender that any degree of prudence would forbid it."

The presumption that the deed is what it purports on its face to be must prevail. *Keithley v. Wood,* 151 Ill. 566, 572.

The decree should be reversed and the cause remanded with directions to overrule the exceptions to the master's report and enter a decree in accordance with his recommendations and the prayer of the complaint.